We're ready to hear arguments in Crewe Tile. Please come forward. Thank you, Your Honor. May it please the court, counsel, Robert Fishman. Could you pull the mic up or push? There you go. Robert Fishman, on behalf of the appellants, as the court is aware, the central question in this case is whether the 2009 distributorship agreement is a valid and enforceable contract, our position, or whether that contract is a forgery and a complete sham. The first two issues raised in our appeal go directly to that question, and those are the issues I want to focus on this morning. The first issue is 404B question, as to whether the district court abused its discretion in admitting evidence of a 2004 agreement involving Ryan Davis, but not Crewe Tile Distribution, and Porcelanosa. That Porcelanosa also alleged was a forgery. That contract, of course, was allegedly executed five years before the contract at issue in this case, and it was with infinite design, not Crewe Tile. And the question, fundamentally, is whether there was any proper purpose within the meaning of 404B for the admission of that evidence. Well, there may have been proper purpose voiced by the district court, but then doesn't the problem become how the evidence was actually used at trial, which is a little different approach from what you're arguing. Well, our position is that the district court did not identify any proper purpose in denying our motion in Lemonade, number one. And the sort of proof of that, I think, is to see how that evidence was actually used at trial. And the important thing about the second piece of that is the way it was used at trial did not come as a surprise to anyone. It was used in precisely the way we said it would be used prior to trial, because that was the only use for it. Well, in fact, weren't you the first one to use it that way? Well, sure, but you have a pretrial ruling that says, I'm sorry, evidence is coming in of the 2004 agreement. Now, when you have a pretrial. But the district court limited that. It can come in for these purposes. So when it's used, isn't it on you to object, to say, Your Honor, I object because this evidence is exceeding the limitation that you gave us? Well, I think no for a number of reasons. The first reason is federal rule of evidence 103, and this court's precedent applying 103, which says when you get a definitive ruling on an evidentiary question, excluding or admitting evidence prior to trial, you do not need to renew an objection to the admission of that evidence at trial. Am I correct that you only cited that supplemental information in your supplemental authority? That's correct. And if you did, then you've waived that. I mean, you can't brief by supplemental authority. You made no reference to that before. And it's not clear to me why, even under that authority, even if it were applicable, that there is not a preservation issue, and this is why. The district court definitively said that what this ruling is not self-executed, and that you have an obligation to go forward and object. And so why didn't that put you on notice that even though there was an unlimited ruling, let's assume that you can rely on that authority, which I think is questionable. But let's assume you can rely on that authority. Why wouldn't that give you notice this is not one of those definitive rulings that you can rely on? Sure, Judge Holmes. I think it relates a little bit to Judge Briscoe's question. You brought this up to begin with. The admonition from the district court judge that the unlimited ruling is not self-executing, which he cites in his motion for new trial, came five days into an eight-day trial. He told us that after almost half of the 29 instances of this evidence being introduced had already come in. So at that point, we're sort of in an impossible position. We have a pretrial ruling saying it's coming in. To your point, Judge Briscoe, at that point, we can say we're going to pretend that didn't happen and we're not going to say anything about it, or we're going to make the strategic decision that I think was made, try to blunt the effect of it right out of the gate, don't let the jury hear about this for the first time from the defense lawyers. But I'm not tracking how you view this. Because if the district court says you can this evidence can come in for this reason, A, and evidence is presented under B, don't you jump up and say, your honor, I object? That's the whole point of a ruling on a motion in limine. The judge said this served a proper purpose. And he defined it. I question if it had any relation to what you all were arguing about. Right. So for example, he said, the district court said, this comes in for the proper purpose of establishing the existence of a relationship between the parties. When a lawyer gets up and asks a witness, are you familiar with the 2004 distributorship agreement? I don't think at that point it is incumbent. I'm not even sure how you would do it to stand up and object and say, this is not being offered for the purpose of establishing a relationship. I mean, you would have to get into the lawyer's head, the witness's head, as to why they're answering this question. And the real reason that I think the order is self-executing and why we were not obligated to object every single time a question was asked about this to make the same argument that we think this is going to an improper purpose is the judge said, this serves legitimate purposes. I've identified them, and it's coming in. And 404B, of course, itself anticipates that you can have evidence admitted that serves a proper purpose, but also goes to bad character. That's the essence of 404B. So it's not really grounds to say, aha, judge, this is reflecting poorly on my client. Ergo, it should be excluded. But if there was any ambiguity in the scope of the order, I mean, it seems to me it was incumbent upon you to address it. In other words, going back to Judge Briscoe's point, I mean, it's questionable whether the articulation of the judge was consistent with or tracked the purposes of 404B. But whatever purposes the court thought it was defining as the boundaries for proper use of this, I mean, if you thought they were exceeded, I think it was incumbent upon you to explain why, wasn't it? I just don't understand why not. Well, I don't think there was any ambiguity about the definitiveness of the order. Well, then, if there was an ambiguity about the definitiveness of the order relative to what it covered, then it would have been clear when there was testimony that strayed from that order. And beyond the point about self-executing, it's not rocket science to say the court defined A, B, and C. And then you hear D being talked about in trial, and you say, no, no, no, no, you can't do D. Frankly, I don't think that would be a proper objection under 404B. Because, as I was trying to explain, 404B says you can't admit evidence of bad character to show action in conformity. You can admit it for all these other purposes. But the it there, the assumption is, it is bad character evidence that's coming in, not to show bad character, but for other reasons. And that's why, for example, the rule anticipates you can get a limiting instruction if you want. Because everybody knows that, by definition, we're talking about 404B evidence. We're talking about prior bad acts. The question is not whether it really is a prior bad act that reflects poorly on the witness. The question is, does it serve some legitimate purpose that can be the justification for its admission? And going back to my colleague's questions, if you think what they're using it for is propensity, rather than a proper purpose, you have an obligation to object and say this goes beyond the scope of your order. Well, I think not. Because, again, it's the Supreme Court seems to think so. And Oler, I mean, you have an obligation to renew your objection at trial. And I guess here, I have even a different question. Before any evidence came in, in your opening statement, you explained to the jury that this was going to be propensity evidence and that it was going to be offered to show that your client was a serial forger. I mean, you were the first one to use this evidence for propensity. You're undoubtedly correct. That's true. But it goes to my response to Judge Briscoe's question, which is, we have a definitive ruling from the court prior to trial. This evidence is coming in because it shows the existence of a relationship between the parties. Our argument has been rejected. Our argument is, it has nothing to do with any material issues in this case. It goes only to propensity. And the judge says, too bad. It's coming in, period. And so again, the choice is, do you, as a trial lawyer, want to just pretend that that ruling didn't happen? And so you're going to ignore the 2004 agreement? And you're not going to try to blunt how you know it's going to be used at trial? And I think the answer clearly is, well, it's not clear. I think it's perfectly legitimate and certainly doesn't constitute any sort of opening the door or invited error to say, I have to deal with the court's pretrial ruling. But all of this is contingent upon the assumption that is predicated in the authority that you submitted in the supplemental authority, which is that this was, in fact, a definitive ruling. And I mean, it would have been easy enough to clarify from the court what its view was as to how definitive this ruling was. Because in the middle of trial, it seemed to not view its ruling as definitive. And so I mean, it seems to me that really is where the problem is. Even if what you did was good trial strategy in terms of saying, OK, this evil exists. I've got to deal with the evil. Well, it seemed to me it was incumbent upon you to clarify whether there was an evil that was not going to change. And therefore, I have to do something about it. I mean, nothing changed about the case between the time the motion in limine was filed and ruled on and the time the case went to trial. Nothing unanticipated became at issue in the trial that would have changed the court's order. Well, generally, these evidentiary rulings are predicated on the notion of context. And in the context of how it plays out in trial, there may be something that causes the court to change its mind, particularly if the court decides, hmm, there may be some reasons that are supported by 404B that I didn't think about at the time that should allow it to come in. Agreed. But the point is, nothing did change. The evidence was introduced for precisely the reason we said it was going to be introduced. And it was not a difficult argument to make because we said, there's no other conceivable use for this. And the judge rejected it. Now, in terms of the definitiveness of the order, Judge Holmes, I mean, I think you have to go back to the very end of the pretrial hearing. Mr. Berg asked for clarification, I think, on the scope of the 702 ruling that the court made. But the court was quite clear. I mean, he said, look, most of the other judges in this building don't even rule on motions in limine, let alone issue a 30-page written order like I've done in this case. And what he said is, my order is the order. What's staying out is staying out. He didn't say, what's coming in is coming in. But that's certainly how we understood it. I think we have your argument on that one. I would like you to proceed to the next issue, the handwriting expert issue. Sure, and very quickly, the Almagico case, I don't know if that's how it's pronounced or not, the Southern District of New York case that Judge Martinez discussed at length in his ruling on Ms. Carlson's testimony. It is true, without question, that there were all sorts of arguments made in that case about the problems with Ms. Carlson's testimony. And there were a number of arguments made in that case that have not been made here. But the, I think, decisive argument that was made, and which does apply with full force and effect in this case, is when you have an expert witness who says their opinion is based on a particular methodology, in this case, a four-step methodology. And she acknowledges that she did not follow one of the four steps. By definition, that opinion conflicts with the requirements of 702D, which is that you have reliably applied a methodology to the facts of the case. By Ms. Carlson's own account, she did not apply the methodology that is the basis of her opinion. And for that reason alone, her testimony should have been excluded in its entirety. And with that, if I could reserve 15 seconds, I will. Thank you. Thank you. May it please the Court. Your Honors, my name is James Thomaitis, and I represent the appellees porcelainosa in this matter. This appeal involves well-settled principles of law regarding evidence that was properly admitted and used at trial. The first, as was discussed previously, is a 2004 contract. That contract is not only relevant under Rule 401, but more probative than prejudicial under Rule 403, and only secondarily was offered for a proper purpose under Rule 404. Secondarily, the testimony of porcelainosa's handwriting expert, which the district court found was admissible, was admitted using a proper federal Rule 702 standard consistent with the district court's gate. But let's talk about that for a minute. How is that true? How is Daubert applied here, when the expert herself says this is the standard that we use as handwriting experts? I did most of it, but I didn't do that last step. Understood. And the court says, that's OK. Your opinion comes in. And I believe the court is referring to the ACEV methodology. Correct. And she didn't do the V. Correct. And the purpose of the verify step in the ACEV methodology is to assess whether a conclusion was arrived at accurately using procedures that are tested and accepted. Here, verify means that the methodology needs to be peer-reviewable, but not necessarily peer-reviewed. So your argument is she, in fact, did complete step V, because it was peer-reviewable? There are a couple of points that I think are important to put out in the context of this argument. The Tenth Circuit has criticized the verification step of the ACEV analysis as not truly independent. For instance, the court in United States versus Baines in the Tenth Circuit 2009 suggests that the verification adds little to add reliability to the ACEV test, and it's not the independent peer review of true science, I think is the quote precisely from Baines. I don't exactly see why that helps you. Because, I mean, as flawed as it may be under our view, at least it's done. And in this instance, it wasn't even done. And that's us talking. That's not the proponent of the test who's saying, this is what's reliable, and this is how we do our tests. And if I recall, correct me on this, it wasn't like she had some reason that was inherent in the science why she didn't do the V. She just didn't do the V, right? Actually, Porcellinosa did do the V twice, but those review components were excluded at trial because of timeliness issues. And so as you know- Well, when she submitted her expert opinion, which you have to do before trial, did that not occur? It was submitted, but it was submitted after the expert disclosure deadline.  Correct. And she had not complied with that. And she said she didn't complete the V because she ran out of time. Correct. That was in the context of a deposition, and subsequently, the V component was completed. But at that point, it was too late, right? And that's correct. OK, so to answer my question, it's not like she had some scientific reason why she didn't do the V. She just ran out of time, which suggests that to the extent that the V has any scientific value and enhances the reliability of the test, that was lost, right? And again, I think this question gets back to the question of whether the methodology is reviewable or whether it is actually reviewed. And one of the really important points that came out of the United States versus Bains is that the verification step in instances like these are not truly independent. In other words, the handwriting analyst in this case would hand off their materials to another handwriting analyst who would presumably come up with a opinion that would reflect what the original handwriting analyst said. But not necessarily. And it's true. That's the lovely thing about experts. You just never know what they're going to say. And that is a true statement, Your Honor. So I mean, there's a purpose in that peer review. And I think the critical differentiation here is that peer review as contemplated in a scientific method is something where peers would review the methodology, the methodology would be standardized, and that methodology then would be applied universally. And this is distinguishable from that, I think, in that some of these technology type expertise, because it's kind of calling for a rote verification when, in fact, essentially all that's doing is causing a plaintiff in this case, or a defendant in this case, to go out and get two expert opinions as opposed to one. The methodology is verifiable. That's the purpose of the ACEV methodology. Well then, I mean, why have the fourth step if it's optional in the methodology? Well, I think a certain amount of that comes down to definition. Technically, the ACEV methodology is verify. And I think kind of a critical question here is whether that means that it is verifiable or whether it is verified. And if it's verifiable, in other words, if the methodology and the process to come to the conclusion is repeatable and has been peer reviewed, then I think that's the proper application of the verify component here. In other words, it's verifiable. In the event that the court concludes that it has to be verified, then you are essentially causing a party in a case like this to have to go out and get two expert opinions. And really, I think the court- You chose the expert. I mean, if you choose to do this, we're not making you do anything. I mean, if you choose to use this to support your case, then you've got to do whatever is required, right? Understood. And I think the district court summed it up fairly concisely in its order regarding experts on September 12, 2016, where it said, the ACV verification step is quite different from what is normally meant by peer review in the scientific and research communities or under a typical Daubert analysis of scientific testimony. And I think that's a proper analysis here. What does that mean? Does it mean that when we're in the world of handwriting experts, it's sort of loosey-goosey? There's really no standard? I'm not, from this attorney's opinion, I'm not wild about loosey-goosey anything. However, the ACE component, I think the reason there's a hyphen there and the V is a verify, kind of a secondary process, is because it will require essentially retaining and getting a second opinion. Well, this evidence that came in was really quite important, right? In fact, everyone, it seemed, that argued in this case at trial emphasized the importance of this expert. If Carlson's testimony is accurate, then what's his name, Mr. Davis, is a forger. Not good. Not good. Understood. And I think the most important consideration there is the totality of the evidence in the case. For example, and maybe much more. It's harmless error? I guess first and foremost, I don't believe that the district court committed any error in this case. But secondarily, the court needs to consider that Porcelanosa general manager Joseph Dominga took the stand and said that he had never seen, negotiated, or signed the 2004 contract. Well, he's a party and he would have interest in saying that. I mean, that's why you have experts that sort of tip the balance. Well, and he hasn't been employed with Porcelanosa for a decade. I don't think had any reason to have been influenced by the former relationship with Porcelanosa. Then, obviously most importantly in this case, you had Jack Handley take the stand. And Jack Handley said, I've never seen, signed, or negotiated the 2009 contract. And in some ways, the most critical part of this is whether the jury chose to believe Jack Handley and Joseph Dominga, or whether they chose to believe Ryan Davis and his family. And I think a really critical part of this is Ryan Davis really made the issue of forgery central to the trial by his own sworn testimony. He said, and this is a quote, there is no part of me that's a forger, and any accusation or claim that is absolutely false. I am sitting here under God and telling everybody inside the courtroom, I did not forge a contract, nor did my family. And any claim stating that is absolutely false. And that's the trial transcript at page 292, 293. So in some ways, I would say that the testimony of the handwriting expert is very much secondary in terms of the central testimony in the case. But the expert said, Davis, not only these individuals that you've just named, they did not sign this document, but that, in fact, he signed it for them. Davis signed it. Isn't that what she said? Well, she did offer an opinion that said that she believed that he was the ultimate signatory for these signatures. Correct. However, I think that is significant. I agree that it's significant, but I think the district court had the discretion, for instance, under Hernandez to be able to make the decision, first and foremost, whether, as a gatekeeper, he was going to allow this 702 testimony, but secondly, the scope of the testimony which would ultimately be admitted. Has our circuit ever permitted this last step that is not only for the expert to say, these are not the signatures of these individuals, but then to take the next step and say, in fact, let me tell you who did sign these documents. And I guess, in a general sense, United States versus Hernandez would give the district court the discretion to decide how to admit testimony and the scope within which to admit that testimony. I don't believe that the Tenth Circuit has ever specifically ruled on whether the ultimate opinion would be admissible. However, there's a case called Stretczyzopol out of, I believe, the Second Circuit. And I'm pretty sure I'm butchering the name. But it stands for essentially the same proposition, which is that to stop a handwriting expert short of giving the ultimate opinion is, in some ways, counterproductive. And Hernandez is unpublished anyway, right? United States versus Hernandez 2002 is unpublished, I believe, Your Honor. So with respect to the issue one, which is the 404 analysis, I think in some ways 404 is a red herring. The most important consideration with respect to this contract is that the parties had a business relationship that stretched back to 2002 when Ryan Davis was an employee at Porcelanosa Los Angeles. And he was ultimately terminated from his position at Porcelanosa Los Angeles for dishonesty. And the Davises and Krutile then subsequently alleged that this contract, this 2004 contract that's at issue here, was executed approximately two weeks later. And it was executed by Joseph Domingat, the individual who hired Ryan Davis. Is there any preservation issue here associated with their 404B argument? And how do you characterize that preservation issue? With respect to preservation, the original, the purported original of this contract. I'm sorry, I'm talking about the ability to object in the 404B context. I'm sorry, I misunderstood. The, I think the most critical consideration there is that Krutile never raised an objection at trial. Judge Martinez specifically said on several different occasions that his prior orders were not self-executing and that objections must be renewed at trial. And that's including at page 1,085 of the trial transcript. Did he say that before the trial ever? Because I mean, I think their argument is the first time he uttered those words was midway in the trial. Right. And my recollection is that it came up in the context of the pretrial conference. However, I don't believe that's a portion of the record in this appeal. So I hate to go there. But what is maybe most important is contrary to Krutile's supplemental briefing that was filed a couple of days ago, Judge Martinez was unequivocal in one thing. And that was that the court's pretrial orders were not self-executing. And that they would need to be renewed at trial. And to find otherwise for Krutile now would be clearly unfair for Porcelanosa. Which means that Krutile, at least under this theory, could have made a 404B. Well, could they have made a 404B objection at trial, period? You're using it for reasons that are not within the scope of 404B. Absolutely. They could have also objected and said, even given the boundaries of your prior order you judge, what they're doing goes beyond the boundaries of that order. Absolutely. And that's notwithstanding the Rule 50 considerations as well. So with respect to the 702 issue, it's Porcelanosa's position that the court was properly acting as a gatekeeper with respect to that handwriting testimony. And that the scope was permissible under the court's broad discretion with respect to admitting testimony of that type for an expert. Thank you, counsel. Thank you. I don't think the point has been lost on the court, but I do want to emphasize it. If Carlson's testimony was not admissible because she failed to follow her own methodology, the prejudice is shown in large part by her opining that my client is a forger. She opined as to the ultimate issue in the case, essentially told the jury what verdict to reach, and essentially said my client was a liar when he testified in the way that my colleague described. Thank you, counsel, for your arguments this morning. The case is submitted. Our next case.